# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FAIRSTEAD CAPITAL MANAGEMENT )
LLC and FCM AFFORDABLE LLC, )
)
Plaintiffs, )
)
v. ) C.A. No. 2022-0673-JTL
)
WILLIAM BLODGETT, )
)
Defendant. )

## OPINION

Date Submitted: October 13, 2022
Date Decided: January 6, 2023

Ryan Stottmann, Thomas P. Will, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael B. Carlinsky, Rollo C. Baker, Jonathan Feder, Alison Lo, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Attorneys for Plaintiffs*.

David E. Ross, Holly E. Newell, A. Gage Whirley, ROSS ARONSTAM & MORITZ LLP; Wilmington, Delaware; Jacob W. Buchdahl, Elisha B. Barron, SUSMAN GODFREY L.L.P., New York, New York; *Attorneys for Defendant*.

**LASTER, V.C.**

The investment fund complex at the center of this case operates under the trade name "Fairstead." Like many fund complexes, Fairstead is a thicket of affiliated entities. Until the dispute giving rise to this case, three human principals controlled the structure, but there was and remains no single, overarching entity. Many of the entities are special purpose vehicles created for specific investments.

Complexity breeds inconsistency, and inconsistency breeds disputes. Fund complexes are particularly fecund. The proliferation of entities strews rights and obligations across multiple agreements, which only the divine could align. Further complicating matters, the different legal cultures that take the lead on the different agreements embrace different norms. For forum selection, entity lawyers favor the courts of the chartering state. Employment lawyers favor mandatory arbitration. A typical fund principal serves in multiple roles with entities in the fund complex and holds a range of interests in those entities, then has some form of employment agreement on the side. That combination sets the stage for a dispute-resolution collision.

This decision addresses such a collision. The fund principal's employment agreement contains an expansive and mandatory agreement to arbitrate all claims relating to his employment.[1] The LLC agreements governing two Delaware entities that owned the

_____

[1] Historically, I would have referred to that aspect of the employment agreement as an arbitration provision, consistent with how Delaware cases generally refer to it and my customary usage for calling out contract provisions. After delving deeply into arbitral authorities for purposes of this case, I have found that arbitral cognoscenti refer to arbitration provisions as arbitration agreements, even when the agreement to arbitrate only features as one provision within a larger agreements. That nomenclature recognizes that the Supreme Court of the United States has directed courts to treat the agreement to

carried interests in various investment vehicles contain mandatory forum selection clauses calling for litigation in this court.

The fund principal's partners (used colloquially) terminated him for cause for allegedly violating his employment agreement. They also declared that they had canceled the fund principal's member interests in the LLCs (or alternatively repurchased them for nothing) because the fund principal had breached his employment agreement.

The fund principal commenced an arbitration in which he sought to litigate whether he had breached his employment agreement and whether his former partners could cancel his member interests. His arbitral demand relied on both the employment agreement and the LLC agreements.

The former partners refused to arbitrate. They caused the LLCs to file suit here for breach of the LLC agreements. Despite having previously relied on breaches of the

---

arbitrate found within a larger contract as a severable, mini-agreement whose enforceability rises and falls separately from the larger agreement, which is known as the container contract. *See, e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967). While aware of the severability principle from a legal standpoint, I had not fully grokked its implications for proper terminology. Viewing the agreement to arbitrate as a separate agreement within the container contract also helps explain why parties can be forced to arbitrate disputes as if they were parties to the arbitration agreement even when they are not parties to the container contract for other purposes. The usage nevertheless takes some getting used to, and I am not sure I like it.

employment agreement as the basis for terminating the fund principal's interests, they now rely scrupulously on the LLC agreements.

More importantly for present purposes, the LLCs sought a permanent injunction barring the fund principal from arbitrating the breaches of the LLC agreements, including the question of whether his member interests were properly canceled. The fund principal countered that the entire dispute should be in arbitration because it related to his employment and thus fell within the scope of the arbitration agreement. He further argued that because the arbitration agreement delegated arbitrability determinations to the arbitrator, the court's only role was to order all of the parties to arbitrate that issue.

The parties filed cross motions for summary judgment to resolve the forum-selection dispute. Each side seeks a mandatory permanent injunction implementing its preferred regime. No one disputes the propriety of issuing that form of relief. They only disagree about what the correct answer is to the forum question.

Although the LLCs filed this action, it is easier to analyze the issues using the fund principal's framework. Normally, the fund principal's reliance on an arbitration agreement that delegates all issues of arbitrability to an arbitrator would be a clean winner. A court must respect such an agreement even if the claim of arbitrability seems wholly groundless.

The LLCs respond that they are not parties to the employment agreement and cannot be forced to arbitrate any issues. Although no Delaware court has spoken clearly on this question, federal precedent interpreting the Federal Arbitration Act (the "FAA") holds that a court must decide whether an arbitration agreement exists. Issues of contract formation cannot be delegated to an arbitrator; they are always for the court. Other issues of

3

arbitrability can be delegated to the arbitrator, including questions of contract validity (*i.e.*, the question of whether the contract that validly came into existence is enforceable). Under these cases, the court must determine whether the LLCs are bound by the arbitration agreement.

Applying principles of equitable estoppel, this decision concludes that the LLCs are bound by the arbitration agreement. Principles of equitable estoppel support binding a non-signatory to an arbitration agreement when the non-signatory has accepted a direct benefit under the contract containing the arbitration agreement. The doctrine of equitable estoppel prevents the non-signatory from accepting the benefits of the contract without also accepting its burdens, including the arbitration agreement. In this case, the LLCs accepted the benefits of the services that the fund principal provided under the employment agreement. That agreement contemplated the formation of the LLCs, called for the former fund principal to provide services to the LLCs, and specified that in return for his services, the fund principal would receive member interests in the LLCs. That is exactly what happened. The LLCs therefore cannot evade the arbitration agreement.

The LLCs argue that the parties subsequently agreed to litigate disputes under the LLC agreements in this court. That too is an issue for this court because it presents another question about the existence of the arbitration agreement that only a court can resolve. But assuming that an arbitrator could decide the issue, it raises a question of substantive arbitrability. An arbitrator only has authority to decide an issue of substantive arbitrability

4

if the arbitration agreement contains clear and unmistakable evidence of an intent to delegate that issue to an arbitrator.

The arbitration agreement in this case broadly delegates all disputes arising out of or relating to the employment agreement to an arbitral tribunal whose rules grant the tribunal the power to determine all issues relating to arbitrability. Normally, that would be sufficient to require that the court defer to the arbitrator. But here, the LLC agreements introduce a competing forum selection provision that calls for litigation in this court. Delaware precedents hold that when multiple agreements contain conflicting and overlapping forum selection clauses, the record lacks clear and unmistakable evidence of an intent to delegate the issue of arbitrability to an arbitrator.

The court therefore must decide which claims must be litigated here and which claims are arbitrable. Sadly, the answer is a mixed bag, which means that litigation will proceed inefficiently in at least two fora.

The claims for breach of the LLC agreements must be litigated in this court. The LLC agreements were executed after the employment agreement, contain integration clauses that wipe out any prior agreements, and provide expressly for litigation here.

Any disputes over whether the fund principal breached his employment agreement are for the arbitrator to decide. The LLCs have hinted that they may seek to litigate those issues in this court by seeking declarations that they validly canceled the fund principal's member interests. There are some potential bases for cancellation that do not implicate the employment agreement and which this court could resolve. But to the extent the LLCs rely on a predicate breach of the employment agreement, the court will not resolve that issue.

5

Once an arbitrator has answered that question, then the parties can return to this court with the result. At that point, the court will use any determination regarding the breach of the employment agreement as an input and make any rulings necessary to adjudicate the parties' remaining claims.

That outcome is wasteful and inefficient. It would be better if one decisionmaker adjudicated the entire dispute. In my experience, fund principals like secrecy, which a public court cannot provide. The obvious answer is to agree to arbitrate all disputes as if they were being litigated in this court. If the parties cannot agree to that result, then they will have to live with the suboptimal outcome that their dispute-resolution collision created.

## I.     FACTUAL BACKGROUND

The following facts are drawn from the record that the parties submitted in support of their cross motions for summary judgment. The parties agree that there are no genuine issues of material fact that are pertinent to disposition of the cross motions. In this situation, Court of Chancery Rule 56 contemplates that the court "shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." Ct. Ch. R. 56(h).

### A.     The Fund Complex

Stuart Feldman, Jeff Goldberg, and William Blodgett saw a business opportunity in affordable housing. Each brought something to the proverbial table. Feldman was a hedge

6

fund manager with capital. Goldberg was an attorney with legal savvy. Blodgett was an entrepreneur with energy and vision.

Together, they formed a Delaware limited liability company called Fortitude Realty Management LLC ("Fortitude"). They planned for Fortitude to source, develop, own, and manage various real estate projects. They did not envision using Fortitude as the sole or even overarching entity for their business. They envisioned creating a series of special purpose vehicles ("SPVs"), each of which would invest in a specific real estate project.

B.      The Employment Agreement

The three principals documented Blodgett's role in the deal through an employment agreement between Blodgett and Fortitude, dated as of October 25, 2013. *See* Compl. Ex. D (the "Employment Agreement" or "EA"). In the Employment Agreement, Blodgett agreed to provide investment and advisory services to Fortitude and its affiliates for the purpose of establishing "Employee Strategy SPVs" that would acquire and develop affordable properties using business strategies that Blodgett developed. Blodgett also agreed to suggest, implement, and assist in the oversight of deals that met the fund complex's investment strategy. *See* EA Ex. A.

As compensation for his services, Blodgett would receive (i) $150,000 annually as base salary; (ii) a first-year discretionary bonus equal to no less than one-third of base salary; and (iii) a 15% share of the carried interest that the management entity received in

7

each Employee Strategy SPV.[2] Blodgett alleges that the vast majority of his compensation was expected to come from his share of the carried interest. Compl. Ex. C ¶ 27.

Section 4(d) of the Employment Agreement elaborated on Blodgett's share of the carried interest. The first paragraph of Section 4(d) confirmed that Blodgett would receive at least 15% of the carried interest, reflecting his "Sharing Percentage."[3] The pertinent language of the Employment Agreement stated:

> Each time an Employee Strategy SPV closes a Property Purchase, Employer shall allocate to Employee 15% (the "Sharing Percentage") of the "promotes" or "carried interests" payable by the Employee Strategy SPVs to their general partners (or other managers) (the "General Partners") with respect to that Property Purchase. Employee's right to the Sharing Percentage shall be documented via a direct equity interest in the applicable General Partners. . . .

EA § 4(d).

Subsequent language in Section 4(d) acknowledged that Fortitude might use a single general partner for multiple SPVs. It also contemplated that Blodgett's Sharing Percentage

---

[2] *See* EA § 4. A carried interest, or profits interest, is a contractual right to a share of an investment fund's profits separate from an interest in the assets or capital of the partnership. A carried interest performs two functions: (i) it compensates the fund manager for managing the fund, and (ii) it incentivizes the fund manager to achieve certain levels of performance by placing some of its compensation at risk. If the fund does well, the managers share in the gains. If the fund does badly and liquidates at a loss, then distributions go to the investors who contributed capital and not to the fund manager. *See generally* David A. Weisbach, *The Taxation of Carried Interests in Private Equity*, 94 Va. L. Rev. 715 (2008); Mark P. Gergen, *Reforming Sub-chapter K: Compensating Service Partners*, 48 Tax L. Rev. 69 (1992).

[3] There were two circumstances where Blodgett's Sharing Percentage could be higher. Neither is pertinent.

8

would be reviewed each year and could be increased. Stated in the language of the

Employment Agreement,

> Employer shall, in its sole and absolute discretion, select the General Partner for each Employee Strategy SPV, bearing in mind that one General Partner may be used for one, all, or any number of Employee Strategy SPVs. The Sharing Percentage shall be reviewed annually and may be increased in the sole and absolute discretion of the Employer.

*Id.*

Finally, Section 4(d) specified the rights that Fortitude and Blodgett would have to

Blodgett's share of the carried interest in the event that Blodgett's employment terminated.

The provision stated:

> Notwithstanding anything contained in this paragraph to the contrary,
>
> (1) solely if Employee quits his employment within 12 months of the closing of any Property Purchase by an Employee Strategy SPV then at Employer's option for solely that Purchased Property, Employee may forfeit his Sharing Percentage for solely such Purchased Property and
>
> (2) if Employer terminates Employee's employment for any reason other than as a result of Employee's breach of <u>Section 6</u> or <u>Section 11</u> of this Agreement, Employer shall allocate to Employee the Sharing Percentages relating to any Pending Employee Strategy SPV upon the closing of such Pending Employee Strategy SPV.
>
> Employee shall have the right to review with counsel, and make reasonable comments (subject to the approval of Employer acting in good faith) to the documentation that will evidence the aforementioned agreement regarding the Shared Percentage.

EA § 4.2(d)(1)–(2) (the "Employment Cancellation Provision") (formatting added). The

parties disagree about the Employment Cancellation Provision. Feldman and Goldberg

claim that it gave Fortitude the right to cause Blodgett to forfeit all of his interests in the

various Employee Strategy SPVs. Blodgett maintains that Fortitude only could cause

9

Blodgett to forfeit his interest in deals completed during the preceding twelve months and that he had a right to his share of any pending deals unless he was terminated for breaching Section 6 or 11 of the Employment Agreement. This decision provides no opportunity to weigh in on that debate.

The two called-out sections—Section 6 and Section 11—impose obligations on Blodgett. Section 6 imposes a confidentiality obligation. EA § 6 (the "Employment Confidentiality Provision"). Section 11 imposes an obligation to comply with all company policies. EA § 11 (the "Employment Compliance Provision"). The specific text of the provisions is not important at this stage of the case.

The Employment Agreement calls for mandatory arbitration of all disputes. The pertinent language states:

> All disputes, claims or controversies, that in any way relate to, arise under, or arise in connection with this Agreement or Employee's employment at Employer, shall be submitted to binding arbitration. Neither party may file any type of lawsuit, petition, proceeding or claim in court, except a proceeding in aid of arbitration pursuant to New York's CPLR in New York State Court. Employee expressly acknowledges and agrees that Employee is giving up the right to bring a claim in court and giving up the right to a trial by jury. Employee expressly acknowledges and agrees to having Employee's disputes, claims or controversies decided by a single arbitrator. The arbitration will be administered by JAMS and the arbitrator must be a former state or federal court judge. The arbitration hearing and all proceedings shall take place in New York County. The arbitrator will be required to correctly apply New York law and shall be required to provide a written decision setting forth the basis for any award or decision rendered in the proceeding. The parties shall have the right to appeal any decision by the arbitrator solely to the extent that the arbitrator did not correctly apply New York law. The prevailing party in the arbitration shall be entitled to an award of attorney

fees by the arbitrator. Other than fees awarded by the arbitrator, each party shall bear its own costs, filing fees and attorney fees.

EA § 16 (the "Employment Arbitration Agreement").

## C.     The Formation Of Fairstead And Affordable

Effective as of November 15, 2013, one month after Blodgett and Fortitude entered into the Employment Agreement, Feldman, Goldberg, and Blodgett formed Fairstead Capital Management LLC ("Fairstead"), a Delaware limited liability company. The internal affairs of Fairstead are governed by its amended and restated limited liability company agreement, executed as of April 25, 2014. Compl. Ex. A (the "Fairstead LLC Agreement" or "Fairstead LLCA").

Fairstead was created to serve as the general partner of the Employee Strategy SPVs and as a vehicle for allocating the carried interests in those entities to the three principals. Using Fairstead as the general partner was consistent with the language of Section 4(d) of the Employment Agreement, which recognized that "one General Partner may be used for one, all, or any number of Employee Strategy SPVs." EA § 4(d). The language of the Fairstead LLC Agreement points to that purpose, with one of the recitals stating that the entity "was formed to own membership and any other equity interests of and act as a member of one or more Persons that may own, hold, sell, renovate, transfer, exchange, operate, or manage real property." Fairstead LLCA at 1. The purpose provision in the

11

Fairstead LLC Agreement repeats that language when identifying one of the company's initial purposes. *Id.* at § 1.3.

Consistent with his deal under the Employment Agreement; Blodgett received a 15% membership interest in Fairstead. The other 85% went to Fortitude Properties LLC, presumably an affiliate of the Fortitude counterparty to the Employment Agreement and an entity controlled by Feldman and Goldberg. *Id.* Sch. I. Feldman signed on its behalf. *Id.* at 33.

Confirming the link between Fairstead and the Employment Agreement, Section 3.6 of the Fairstead LLC Agreement stated that "[t]he Interest held by William Blodgett as of the date hereof shall be treated as a 'promote' or 'carried interest' in exchange for his services as any employee to one or more Affiliates of the Company." *Id.* § 3.6. In their complaint in this action, Fairstead and Affordable acknowledge that Blodgett received his units in return for his services as an employee. Compl. ¶ 112.

As a practical matter, using Fairstead as a single general partner for the SPVs simplified the entity structure for the fund principals. Whenever Fairstead acted as the general partner of an SPV and received carried interest, Blodgett would receive an indirect 15% share, just as the Employment Agreement contemplated.

The Fairstead LLC Agreement contains a mandatory forum selection provision requiring parties to litigate disputes in this court. The relevant language states:

> This Agreement, and the application or interpretation hereof, shall be governed by and in accordance with the laws of the State of Delaware applicable to agreements made and fully to be performed therein, and specifically the Act. Any action or proceeding hereunder must be commenced and prosecuted exclusively in the state or Federal courts located

in the State of Delaware, and each Member hereby waives any objection such Person may have based on improper venue or inconvenient forum in connection with any such action or proceeding in any such court.

Fairstead LLCA § 12.3 (the "LLC Forum Provision"). The LLC Agreement also contained an integration clause, which states: "This Agreement (including any Schedule hereto) and the Certificate of Formation embody the entire understanding and agreement between the Members concerning the subject matter hereof and supersede any and all prior negotiations, understandings or agreements with respect thereto." *Id.* § 12.4 (the "LLC Integration Clause").

Over the next several years, the parties worked together harmoniously. Blodgett claims that he "turned the operation known as 'Fairstead' into a massive success." *See* Dkt. 22 at 8. He asserts that he became "the face of the Company" and "multiplied its value many-fold by identifying, acquiring, and managing properties held through the Fortitude Affiliates." *Id.* He maintains that he "won, negotiated, financed, developed, and closed on scores of deals creating hundreds of millions of dollars of value." Compl. Ex. C ¶ 23. One can infer that the principals created a series of SPVs for which Fairstead served as the general partner, resulting in Fairstead owning carried interests in those entities.

Effective as of September 14, 2016, Feldman, Goldberg, and Blodgett formed a second entity called FCM Affordable LLC ("Affordable"). It too was a Delaware LLC, and its internal affairs are governed by its limited liability company agreement. Compl. Ex. B. At this stage of the litigation, Affordable appears to have fulfilled much the same function as Fairstead, *i.e.*, serving as a general partner for Employee Strategy SPVs. It is not yet clear why the principals created Affordable in addition to Fairstead. The LLC agreements

13

governing Fairstead and Affordable are substantively identical (jointly, the "LLC Agreements"). For simplicity, this decision refers to and analyzes the provisions in the Fairstead LLC Agreement.

Blodgett received a 15% member interest in Affordable. The other 85% went to an entity called FCM-JD2 LLC. *Id.* Sch. I. Goldberg signed on its behalf. *Id.* at 34.

During this period, the principals created a number of other entities that became part of the Fairstead fund complex, including FSC Realty Management LLC, FSC EF&F LLC, Fortitude Properties LLC, FSC-JD2 Member LLC, and FCM-JD2 LLC. It is frankly not clear what role each of those entities plays.[4]

## D.     Disputes Arise.

In 2020 and 2021, disputes arose over Blodgett's share of the pie. Everyone agrees that Blodgett wanted more of the returns that he felt he was generating.

Blodgett claims that he made a reasonable ask for fair compensation. As he tells the story, "Blodgett and certain members of his team expressed to Feldman and Goldberg that the allocation of equity and the current governance of Fairstead insufficiently compensated the people who created the value." Dkt. 22 at 11. To the extent Blodgett asked for more

---

[4] It is always difficult to map the entity web generated by a fund complex. For the principals, that is a feature, not a bug. At least for as long as the principals are not having disputes, the various entities are transparent and instrumental. Lawyers can prepare whatever documents are needed to achieve the result that the principals want. At the same time, in its outward facing dimension, the multi-faceted web of entities enables the principals to present the situationally optimal view to a court or regulator. If the principals want to hide behind an entity veil, then they can. If they find it advantageous to emerge from behind the veil and admit their control, they can do that too.

14

going forward, his request was consistent with the Employment Agreement, which contemplated that Blodgett's Sharing Percentage would be reviewed on an annual basis and could be increased. Blodgett also seems to have been seeking retroactive increases in his share of past deals. According to Blodgett, Goldberg was receptive and asked Blodgett and a member of his team to develop a restructuring plan and encouraged them to hire outside counsel to assist. *Id.*

In May 2021, Blodgett presented Feldman and Goldberg with the restructuring plan and a term sheet for what he described as "Fairstead 2.0." Blodgett envisioned that he would serve as the new head of the fund complex and would own nearly all its equity. *Id.*

Feldman and Goldberg rejected Blodgett's restructuring plan. *Id.* Blodgett then told Feldman and Goldberg that he was leaving to start his own venture. *Id.*

When giving their version of events, Feldman and Goldberg agree on the general timeline, but they portray Blodgett's demands more cynically. They claim that Blodgett wanted to take over Fairstead, and they allege that he threatened to use his extended family's wealth to ruin Fairstead if Feldman and Goldberg did not concede. Dkt. 18 at 5.

**E.    The Termination Letter**

On September 14, 2021, Feldman and Goldberg caused Fortitude to send a termination letter to Blodgett. In cumbersome language, it stated:

> The termination of your employment is for reason pursuant to the employment agreement, dated October 25, 2013 between the Company and you (the "Employment Agreement"), due to your material breaches, which include, without limitation, noncompliance of the Company's policies (including the breach of Sections 6 and 11 of the Employment Agreement). The Company will continue to pay your Base Salary and Benefits as defined

15

in the Employment Agreement pursuant to the time limitations specified in Section 7(b).

Accordingly, your Sharing Percentage of any pending Employee Strategy SPV as defined in Section 4(d) of the Employment Agreement and any Interest (as defined in the applicable operating agreement) or the equivalent in [Fairstead], FSC Realty Management LLC, [Affordable] and any other affiliate of [Fortitude], are hereby forfeited and cancelled.

Dkt. 22 Ex. B. Notably, the letter only relied on the Employment Agreement. The letter did not claim that Blodgett had breached any provision in the LLC Agreements.

As an alternative to Blodgett's termination, the letter included terms on which Feldman and Goldberg proposed to participate in Blodgett's new affordable housing venture. *Id.* Goldberg told Blodgett that the term sheet was an "opening foray" and asked Blodgett to keep working on deals for Fairstead. *See* Dkt. 22 at 13.

Not surprisingly, Blodgett rejected the opening bid. Later that month, he moved forward with his new venture by forming Tredway LLC and Tredway Management LLC.

## F. The Disputes Under The Employment Agreement

In November 2021, letters flew back and forth between the two sides. Blodgett kicked off the exchange by sending Goldberg a letter dated November 5, 2021. That letter stated that Blodgett planned to start a business and was exercising his right to terminate the

16

Severance Period provided for in Section 7(b) of the Employment Agreement, during which he was required to provide transition assistance to Fortitude. *See* Dkt. 22 Ex. D.

By letter dated November 9, 2021, Fortitude challenged Blodgett's ability to start a new business before returning all of Fortitude's confidential information and property. That letter stated:

> Before you take any further actions with respect to your new business venture, you must return, without retaining any copies, all documents, information and other material in your possession or control containing, reflecting and/or relating, directly or indirectly, to any Confidential Information as defined in Section 6 of the Employment Agreement. If any such documents are stored on your personal devices, laptops, computers, USB drives, or cellular phones, you must immediately return those documents. You must return all property of the Company that is in your possession, including, without limitation, all keys and security passes to the Company's offices, any Company credit cards, the Company's laptop computer, and any Company network security devices.

Dkt. 22 Ex. E. The letter relied exclusively on the Employment Agreement. It did not mention the LLC Agreements.

By letter dated November 11, 2021, Blodgett's counsel informed Fortitude that Blodgett had given his security card and his company-issued laptop to his lawyers and therefore no longer had access to Fortitude's confidential information. *See* Dkt. 18 Ex. 1. Blodgett's counsel represented that Blodgett had conducted a search for confidential information stored on other work-related devices and that Blodgett would retain copies of the pertinent files and Dell laptop "[b]ecause of the potential for litigation." *Id.*

Fortitude's counsel responded on December 9, 2021. This time, Fortitude's counsel wrote "on behalf of FSC Realty Management LLC and its affiliates (collectively, 'Fairstead')." Dkt. 22 Ex. F. The letter instructed Blodgett to return all company property

17

by December 15, 2021. *Id.* The letter stated that Fairstead had not consented to Blodgett's proposal to wipe the devices before returning them, "even if Mr. Blodgett proposes to back up the contents of both devices." *Id.* at 2. The letter relied exclusively on policies in various employee handbooks.

Blodgett did not return his devices, prompting Fairstead's counsel to write again by letter dated January 5, 2022. This time, counsel demanded that Blodgett return a MacBook and an iPad that were "still in Mr. Blodgett's possession." Dkt. 22 Ex. G. The letter also stated that "a forensic audit has confirmed that Mr. Blodgett downloaded thousands of documents from Fairstead's servers during the period preceding his termination from Fairstead . . . [which] contain confidential and proprietary information, as defined in Section 6 of his Employment Agreement." *Id.* The letter only cited the Employment Agreement. It did not mention the LLC Agreements.

Blodgett's counsel did not respond until March 29, 2022. *See* Dkt. 22 Ex. H. In that letter, counsel confirmed that they continued to retain the company-issued laptop and security card. *Id.* at 1. Counsel asserted that Blodgett was entitled to retain the MacBook and the iPad because he had purchased them, even though counsel conceded that Blodgett "may have been reimbursed by Fairstead." *See id.* Counsel also described their efforts to collect and preserve data from Blodgett's devices.

**G.    Feldman And Blodgett Invoke The LLC Agreements.**

In April 2022, Feldman and Goldberg finally mentioned the LLC Agreements. In a letter dated April 5, 2022, their counsel asserted that as a result of Blodgett's termination for breach of Sections 6 and 11 of the Employment Agreement, Blodgett's interests in

18

Fairstead and any of its affiliates were forfeited and canceled. *See* Dkt. 22 Ex. A at 2 ("We take the position that Mr. Blodgett was terminated for a breach of Sections 6 and 11 of his Employment Agreement and that his Interests in Fairstead and any of its affiliates were consequently forfeited and cancelled."). After asserting that Blodgett had been terminated for breaching the Employment Confidentiality Provision and the Employment Compliance Provision in the Employment Agreement, counsel claimed that Blodgett's interests were canceled "pursuant to Section 3.6 of the [LLC Agreements]." *Id.* The April 5 letter was the first time that Feldman and Goldberg's counsel relied explicitly on the LLC Agreements.

Section 3.6 of the LLC Agreements is a lengthy and dense provision. The language addressing the potential cancellation of Blodgett's interests states:

> Notwithstanding anything contained in this <u>Section 3.6</u> to the contrary, (a) solely if Mr. Blodgett terminates his employment with any Affiliate of the Company for any reason within 12 months following the closing of the acquisition of any real property by an Affiliate of the Company, then the Company has the option, not the obligation, to cancel any portion of or all Interests then held by Mr. Blodgett effective as of the date of such termination of employment or any date thereafter such that no Net Profits and Net Losses attributable to such property would be allocated and no distributions attributable to such property would be made to Mr. Blodgett, and
>
> (b) if any Affiliate of the Company terminates Mr. Blodgett's employment for any reason other than as a result of his unauthorized disclosure of certain proprietary information of such Affiliate or his noncompliance of such Affiliate's policies (including, for the avoidance of doubt, his breach of Section 6 or 11 of that certain Employment Agreement dated as of October 25, 2013 by and between Fortitude Realty Management LLC and Mr. Blodgett), no Interest held by Mr. Blodgett shall be forfeited or canceled.
>
> Any distributions to which Mr. Blodgett would otherwise have been entitled pursuant to any canceled Interest shall be allocated to all other Interest Holders, *pro rata*, based on their Interests (excluding Mr. Blodgett).

19

Fairstead LLCA § 3.6 (the "LLC Cancellation Provision") (formatting added). The LLC Cancellation Provision thus generally tracks the Employment Cancellation Provision. The principal difference is in Section 3.6(b), which generally provides that Blodgett's interests *cannot* be canceled if he was terminated "for any reason other than as a result of his unauthorized disclosure of certain proprietary information of such Affiliate or his noncompliance of such Affiliate's policies (including, for the avoidance of doubt, his breach of [the Employment Confidentiality Provision or the Employment Compliance Provision])." Under the Employment Cancellation Provision, any cancellation right that might exist can only be exercised if Blodgett has been terminated for breaching the Employment Confidentiality Provision or the Employment Compliance Provision. Under the LLC Cancellation Provision, whatever cancellation rights the LLCs might possess can be exercised if Blodgett is terminated for breaching other, similar restrictions, including but not limited to the Employment Confidentiality Provision or the Employment Compliance Provision.

In a fallback argument, Feldman and Goldberg claimed to have redeemed Blodgett's interests under Section 8.7 of the LLC Agreements "as of . . . September 14, 2021, the date

20

of his termination." Dkt. 22 Ex. A at 2. Feldman and Goldberg claimed that the units had no value, so the purchase price was zero. *Id.*

The redemption mechanism found in Section 8.7 of the LLC Agreements gave Blodgett the right to dispute the purchase price and to appoint an appraiser to value his interests. By letter dated May 4, 2022, Blodgett exercised that right. *See* Dkt. 22 Ex. I.

Feldman and Goldberg refused to engage on the redemption. By letter dated May 5, 2022, their counsel reiterated their position that all of Blodgett's interests "were forfeited and cancelled, and therefore have no value, based on Mr. Blodgett's termination for breaches of Sections 6 and 11 of his Employment Agreement." Dkt. 22 Ex. J at 1. The letter did not mention the LLC Agreements.

## H.    Blodgett Initiates Arbitration.

The correspondence from Feldman and Goldberg made clear that they claimed Blodgett had breached Sections 6 and 11 of the Employment Agreement—the Employment Confidentiality Provision and the Employment Compliance Provision—and that his member interests had been canceled on that basis. The dispute was whether Blodgett had breached those provisions in the Employment Agreement and the scope of any attendant cancellation right.

On May 24, 2022, Blodgett filed an arbitration demand with JAMS that sought to address those issues. *See* Compl. Ex. C. He named as respondents Feldman, Goldberg,

21

Fortitude, Fairstead, Affordable, and other entities in the Fortitude and Fairstead fund complexes (the "Arbitration Respondents"). *Id.* ¶¶ 10–14.

Blodgett's principal claim invoked the Employment Agreement. He contended that the Arbitration Respondents breached the Employment Agreement by purporting to terminate him for cause based on alleged breaches of the Employment Confidentiality Provision and the Employment Compliance Provision. *See id.* at 17. He also alleged that the termination was a pretext for depriving Blodgett of the member interests he had earned under his Employment Agreement. *See id.*

Blodgett also maintained that the LLC Agreements did not permit the cancellation of his interests, and he asserted claims for breach of both the express terms of the LLC Agreements and implied terms supplied by the implied covenant of good faith and fair dealing. *See id.* at 18–22. Finally, Blodgett brought claims for conversion and unjust enrichment based on the purported cancellation of his interests. *See id.* at 22–24.

It takes a measure of cooperation to start an arbitration, and the Arbitration Respondents moved slowly. On the day before their answer was due, they asked for an extension. *See* Dkt. 22 Ex. K. They received that courtesy. *Id.*

Barely one week later, on June 10, 2022, the Arbitration Respondents served an answer stating that "Certain Respondents will be commencing an action in the courts of the State of Delaware to determine, among other things, whether Claimant's claims are arbitrable." *See* Dkt. 22 at 19. That was a reference to what would become this proceeding.

Between June 16 and July 7, 2022, JAMS personnel repeatedly emailed the Arbitration Respondents to confirm the status of the case and to collect the initial

arbitration fee. Dkt. 22 Ex. L. JAMS made four separate requests. *Id.* No one responded. On July 6, Blodgett paid Fortitude's fee. *See* Dkt. 22 at 19.

On July 21, 2022, the lawyers for the Arbitration Respondents notified JAMS that the Arbitration Respondents had retained new counsel. *Id.* Blodgett had been prepared to file a motion to compel arbitration in New York state court. After conferring with the Arbitration Respondents' new counsel, he agreed to delay his filing by five days. *Id.* On July 26, Blodgett filed a petition in the New York State Supreme Court for the County of New York to compel arbitration pursuant to CPLR 7503(a). *See* Dkt. 22 Ex. M.

## I. This Litigation

On August 1, 2022, Fairstead and Affordable filed this lawsuit against Blodgett. *See* Dkt. 1. The operative complaint contains four counts. Despite having focused on the Employment Agreement in prior correspondence with Blodgett, the complaint exclusively invokes provisions of the LLC Agreements.

In Count One, Fairstead asserts that Blodgett acted improperly by disclosing and misusing confidential information. Previously, Feldman and Goldberg took the position that Blodgett's conduct violated the Employment Confidentiality Provision. In this action, Fairstead eschews that provision, claiming instead that Blodgett breached a separate confidentiality obligation found in the Fairstead LLC Agreement. Fairstead LLCA § 8.3(b) (the "LLC Confidentiality Provision"). The specific language of the provision is not important for this decision. It is sufficient to note that it makes no reference to and exists independently of the Employment Confidentiality Provision.

23

Fairstead also contends in Count One that Blodgett's conduct violated his obligation to act in good faith. In a provision that starts by eliminating all fiduciary duties, the Fairstead LLC Agreement provides that notwithstanding that step, "each Member shall . . . act honestly and in good faith in its dealings with the Company and the Members." Fairstead LLCA § 6.11(b) (the "LLC Good Faith Provision").

In Count Two, Fairstead seeks declaratory judgments to the effect that Blodgett violated the LLC Confidentiality Provision and the LLC Good Faith Provision. Fairstead further seeks a declaration that in light of these alleged breaches, Fairstead properly declared that all of Blodgett's member interests had been canceled under the LLC Cancellation Provision. Previously, Feldman and Goldberg had relied exclusively on breaches of the Employment Agreement to support the purported cancellation of Blodgett's interests. Now they shifted course.

In Counts Three and Four, Affordable asserted the same claims under the Affordable LLC Agreement.

In addition to filing their complaint, Fairstead and Affordable sought a permanent injunction barring Blodgett from arbitrating claims arising under the LLC Agreements. That motion prompted the parties to engage on whether this case would proceed in this court or in arbitration.

## II. LEGAL ANALYSIS

The parties have filed cross motions for summary judgment on the issue of whether this case will proceed in this court or in arbitration. Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any

24

material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The parties agree that there are no genuine issues of material fact that are pertinent to the cross motions and that the issue is solely one of law.

Fairstead and Affordable maintain that they cannot be compelled to arbitrate as a matter of law because they are not parties to the Employment Agreement, which contains the Employment Arbitration Agreement. They maintain that they never formed a contract with Blodgett that would entitle him to force them to arbitrate.

Fairstead and Affordable further argue that Blodgett cannot arbitrate any disputes under the LLC Agreements as a matter of law because of the LLC Forum Provision. They emphasize that they only have asserted claims for breach of the LLC Agreements and have not asserted any claims under the Employment Agreement. They point out that even if the subject matter of the claims might somehow overlap with the Employment Agreement, the LLC Integration Clause wipes out the Employment Arbitration Agreement as to the subject matter of the LLC Agreements.

Blodgett maintains that that the Employment Arbitration Agreement delegates to the arbitrator the power to address issues of substantive arbitrability. He contends that some or all of this dispute is arbitrable because the plaintiffs and their affiliates consistently relied on breaches of the Employment Agreement as the basis for his termination and the forfeiture of his interests. He views the plaintiffs' current claims for breach of the LLC Agreements as a pretextual recasting of their prior claims for breach of the Employment Agreement. Blodgett contends that this court must defer to the arbitrator to decide whether Fairstead and Affordable must arbitrate, including on the issue of whether Fairstead and

25

Affordable are parties to the Employment Arbitration Agreement. To the extent this court decides the issue of arbitrability, he maintains that Fairstead and Affordable are bound by the Employment Arbitration Agreement and that its terms are broad enough to encompass the claims asserted in this action.

This case thus presents issues of both contract formation and contract interpretation. The principal question of contract formation is whether Fairstead and Affordable are bound by the Employment Arbitration Agreement. The principal questions of contract interpretation involve the implications of the LLC Integration Clause and the interrelationship between the Employment Arbitration Agreement and the LLC Forum Provision.

Summary judgment is an appropriate framework for resolving these issues. Taking them in reverse order, "summary judgment is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact." *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005). "[P]ure matters of contractual interpretation" are "readily amenable to summary judgment." *see also Barton v. Club Ventures Invs. LLC*, 2013 WL 6072249, at *5 (Del. Ch. Nov. 19, 2013).

Where there are no genuine issues of material fact, Delaware courts can rule on contract formation as a matter of summary judgment. *See, e.g.*, *Ins. Coverage Off. v. DiSabatino Constr. Co.*, 2022 WL 811167, at *4 (Del. Super. Ct. Mar. 17, 2022); *Price v. State Farm Mut. Auto. Ins. Co.*, 2013 WL 1213292, at *6–7 (Del. Super. Ct. Mar. 15, 2013), *aff'd*, 77 A.3d 272 (Del. 2013). Sometimes, however, genuine issues of material fact may

26

prevent a court from resolving a dispute over formation at the summary judgment stage. *See, e.g.*, *Lockwood v. Capano*, 105 A.3d 989 (Del. 2014); *In re Appraisal of Enstar Corp.*, 1989 WL 11139, at *4 (Del. Ch. Jan. 31, 1989). In this case, there are no genuine issues of material fact, so the issue of contract formation can be decided as a matter of law.

## A.   The Structure Of An Arbitrability Determination

Arbitration agreements are ubiquitous. In theory, parties can enter into a contract consisting solely of an agreement to arbitrate a particular controversy. Such an agreement would be a pure arbitration agreement.

More often, parties enter into broader contracts that contain agreements to arbitrate controversies that bear some level of relationship to the contract. In the parlance of the arbitration world, the arbitration provision is called an arbitration agreement.[5] That usage reflects the Supreme Court of the United States' determination that under the FAA, the

---

[5] *See* 1 Martin Domke et al., *Domke on Commercial Arbitration* § 8:1, Westlaw (database updated June 2022) ("There are two types of arbitration agreements. One type consists of a contract clause under which the parties agree to make use of arbitration to decide future disputes arising out of the contractual relationship. The other type is an independent agreement under which the parties agree to submit an existing dispute to arbitration. This second type of arbitration agreement is called a submission. Because both types of agreements are contracts, the relation of the parties is contractual, and the rights and liabilities of the parties are controlled by the law of contracts."); Hossein Fazilatfar, *In Defense of Separability:* Prima Paint*,* Buckeye*, and* Rent-A-Center, 54 Tex. Tech L. Rev. 183, 186 (2022) ("An arbitration clause is an agreement inside an agreement." (cleaned up)); George A. Bermann, *Arbitrability Trouble*, 23 Am. Rev. Int'l Arb. 367, 371 (2012) [hereinafter Bermann, *Arbitrability Trouble*] (defining an "arbitration clause" as "an agreement separate and apart from the main contract").

agreement to arbitrate is treated as a mini-contract,[6] separate and severable from the overarching contract.[7] The overarching contract that specifies the other rights and obligations between the parties is sometimes called the container contract.[8]

When parties disagree about whether an arbitration agreement extends to a particular controversy, disputes may exist at three levels.[9] The ultimate question is whether the underlying merits dispute falls within the scope of the agreement to arbitrate. That level

---

[6] *See, e.g.*, David Horton, *The Federal Arbitration Act and Testamentary Instruments*, 90 N.C.L. Rev. 1027, 1055 (2012) ("[T]he separability rule transforms arbitration clauses into their own freestanding mini-contracts within larger container contracts.").

[7] *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 440 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."); *see also* 6 C.J.S. *Arbitration* § 11 ("[A]n arbitration provision is severable from the remainder of the contract, and such law applies in either state or federal courts.").

[8] *See, e.g.*, *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020) ("Under this severability rule, a party cannot avoid arbitration by attacking the contract containing the arbitration clause as a whole (the 'container contract')."); David Horton, *Arbitration As Delegation*, 86 N.Y.U.L. Rev. 437, 449 (2011) ("[A]ny contract that contains an arbitration clause is, in fact, two contracts: (1) a contract to arbitrate disputes and (2) the overarching container contract.").

[9] *See generally* Alan Scott Rau, *The Allocation of Power Between Arbitral Tribunals and State Courts*, *in* 390 Collected Courses of the Hague Academy of International Law 252 (2018) (referring to "three separate levels of inquiry:" "How should a particular substantive issue be decided? . . . Who is to decide the level No. (i) issue? . . . [and] just who is to decide the level No. (ii) issue?").

of analysis asks whether the underlying merits dispute is arbitrable,[10] and this level of inquiry is often called the "arbitrability question."[11]

The next level of inquiry asks whether a court or an arbitrator decides the arbitrability question. This level of inquiry is often called the "who-decides question."[12] Courts have developed presumptions about whether a court or an arbitrator decides particular dimensions of the arbitrability question.

A third level of inquiry asks whether the parties have agreed to have an arbitrator decides the arbitrability question. A provision that confers the authority to decide on an arbitrator is often called a "delegation provision," and this level of inquiry is often called

---

[10] *See DMS Props.-First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 393 (Del. 2000) ("[T]he arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute").

[11] *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019) ("When a dispute arises, the parties sometimes may disagree not only about the merits of the dispute but also about the threshold arbitrability question—that is, whether their arbitration agreement applies to the particular dispute.").

[12] *See, e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 87 (2010) (Stevens, J., dissenting) ("[W]hen questions of arbitrability are bound up in an underlying dispute . . . there is actually no gateway matter at all: The question 'Who decides' is the entire ball game."); *Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 326 (3d Cir. 2022) (ruling on the "'who decides' question"); *McKenzie v. Brannan*, 19 F.4th 8, 16 (1st Cir. 2021) (same).

the "delegation question."[13] This decision calls it a "delegation agreement,"[14] because it is treated as its own mini-arbitration agreement.[15]

Jurists and scholars have invoked a variety of metaphors for the resulting "mind-bending" structure,[16] referring to the nested layers of arbitration agreements as Russian

---

[13] *See, e.g.*, *SEIU Local 121RN v. Los Robles Reg'l Med. Ctr.*, 976 F.3d 849, 852 (9th Cir. 2020) (describing the three disputes involved in the case as "(1) the 'Merits Question'—a dispute between the parties regarding the merits of an issue . . . (2) the 'Arbitrability Question'—a dispute regarding whether the parties agreed to arbitrate the Merits Question . . . and (3) the 'Delegation Question'—a dispute regarding whether an arbitrator or a court is tasked with deciding the Arbitrability Question."); *accord* 1 Domke et al., *supra*, § 15:11.50 n.2 ("[The] delegation question asks whether the parties agreed to have arbitrator decide specific matter of arbitrability" (citing *SEIU Local 121RN*)).

[14] *See, e.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019) ("A delegation clause gives an arbitrator authority to decide even the initial question whether the parties' dispute is subject to arbitration. . . . A delegation clause is merely a specialized type of arbitration agreement . . . ."); *Rent-A-Ctr.*, 561 U.S. at 68 (describing delegation provision as "an additional, antecedent [arbitration] agreement"). Before *Rent-A-Center*, it was possible to say that "delegation provisions, having never been severed from contracts, are not expected to have the same 'mini'-contract qualities that characterize arbitration clauses." Meredith Goldich, *Throwing Out the Threshold: Analyzing the Severability Conundrum Under* Rent-A-Center, West, Inc. v. Jackson, 60 Am. U.L. Rev. 1673, 1698 (2011). After *Rent-A-Center*, a delegation agreement is deemed to be another mini-agreement, inside the arbitration agreement, inside the container contract.

[15] *See, e.g.*, *Rent-A-Ctr.*, 561 U.S. at 85 (Stevens, J., dissenting) ("The Court . . . reads the delegation clause as a distinct mini-arbitration agreement divisible from the contract in which it resides—which just so happens also to be an arbitration agreement.").

[16] *See Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 140 (3d Cir. 2022) ("We are once again confronted with the 'mind-bending issue' of arbitration about arbitration." (quoting David Horton, *Arbitration About Arbitration*, 70 Stan. L. Rev. 363, 370 (2018) [hereinafter Horton, *Arbitration About Arbitration*]).

Matryoshka dolls,[17] boxes within boxes,[18] and the "hole in the doughnut's hole."[19] But even at the level of the delegation agreement, "arbitration is simply a matter of contract between the parties." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."[20] By the same token, a party must arbitrate a dispute where the party has agreed to arbitrate.[21] Because whether a particular

---

[17] *See Rent-A-Ctr.*, 561 U.S. at 85 (Stevens, J., dissenting) ("Today the Court adds a new layer of severability—something akin to Russian nesting dolls—into the mix: Courts may now pluck from a potentially invalid *arbitration agreement* even narrower provisions that refer particular arbitrability disputes to an arbitrator.")

[18] *See Ex parte Perry*, 744 So.2d 859, 866 n.5 (Ala. 1999) ("It is the dilemma of the box within a box or, in the case of arbitration, the authority as to the decision as to the authority to make the decision.").

[19] *See* Tamar Meshel, *"A Doughnut Hole in the Doughnut's Hole": The* Henry Schein *Saga and Who Decides Arbitrability*, 73 Rutgers U. L. Rev. 83, 86 (2021) (drawing on Rian Johnson's 2019 film, *Knives Out*).

[20] *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002); *accord Chemours Co. v. DowDuPont Inc.*, 2019 WL 6973877, at *1 (Del. Ch. Dec. 19, 2019) (ORDER) ("[T]o allow the Arbitration to proceed would force the Plaintiff to submit to an arbitration absent a contractual obligation to do so, which, I find to be irreparable harm"); *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 842 A.2d 1245, 1259 (Del. Ch. 2004) ("It is well settled that parties cannot be required to arbitrate non-arbitrable claims and that the procession of an unwarranted arbitration poses the threat of irreparable injury to the party rightfully resisting arbitration.").

[21] *See, e.g.*, *PPF Safeguard, LLC v. BCR Safeguard Hldg., LLC*, 2010 WL 2977392, at *5 (Del. Ch. July 29, 2010) ("Delaware respects the contractual freedom of parties to enter arbitration agreements and will not allow a party to escape its promise to resolve claims by arbitration by filing in our courts").

31

controversy is arbitrable is itself a type of controversy, parties can agree to arbitrate that issue through a delegation agreement.

### 1. The Arbitrability Question

In its most general sense, "[a]rbitrability relates to whether the parties intended to submit a specific dispute to arbitration." 1 Domke et al., *supra*, § 15:8. The Delaware Supreme Court has used similar language, stating that the "question of arbitrability" is "[t]he question of whether the parties have submitted a particular dispute to arbitration." *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006).

When deployed as a standalone term, the concept of arbitrability is "used very broadly" and connotes "every condition or requirement that must be met in order for an arbitration to go forward." George A. Bermann, *The "Gateway" Problem in International Commercial Arbitration*, 37 Yale J. Int'l L. 1, 10 (2012). Consequently, whether an issue is arbitrable or non-arbitrable may turn on a number of grounds:

- Arbitrability may turn on whether the domestic law of a particular sovereign permits an issue to be arbitrated.[22] For civil claims involving private litigants in the United States, Section 2 of the FAA effectively eliminates concerns about whether a dispute may not be arbitrable because of an issue of domestic law.

---

[22] *See* Bermann, *Arbitrability Trouble*, *supra*, at 371 ("[A] claim or dispute is 'non-arbitrable' within a given legal system if the system's legislature or, less commonly, the system's courts acting on their own determine that its adjudication is reserved, as a matter of law, to the courts of that system. This represents what may be called arbitrability *stricto sensu*.").

32

- Arbitrability may turn on whether an arbitration agreement was ever formed.[23]

- Arbitrability may turn on whether, even though the arbitration agreement was formed, the agreement is nevertheless unenforceable due to fraud, duress, or unconscionability.[24]

- Arbitrability may turn on whether the controversy falls within the scope of an arbitration agreement.[25]

- Arbitrability may turn on whether a party complies with the procedural requirements necessary to arbitrate a dispute.[26]

Decisions frequently group these issues into two categories by drawing a line between substantive arbitrability and procedural arbitrability. The category of substantive arbitrability encompasses gateway issues that are presumptively for a court to decide, such as the scope, validity, and enforceability of an arbitration agreement, whether it encompasses the controversy in question,[27] and "whether the parties are bound by a given

---

[23] *See, e.g.*, *China Minmetals Mat'ls Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 277 (3d Cir. 2003); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 590 (7th Cir. 2001).

[24] *See, e.g.*, *Buckeye*, 546 U.S. at 444; *Prima Paint*, 388 U.S. at 425.

[25] *See, e.g.*, *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008); *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532–33 (3d Cir. 2005).

[26] *See, e.g.*, *Lumbermens Mut. Cas. Co. v. Broadspire Mgmt. Servs.*, 623 F.3d 476, 477 (7th Cir. 2010); *Shopman's Local 493 v. EFCO Corp.*, 359 F.3d 954, 956 (8th Cir. 2004).

[27] *See, e.g.*, *Howsam*, 537 U.S. at 83–84 ("[A] disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court."); *Viacom Int'l, Inc. v. Winshall*, 72 A.3d 78, 82 (Del. 2013) ("Issues of substantive arbitrability are gateway questions relating to the scope of an arbitration provision and its applicability to a given dispute. . . .") (cleaned up); *Legend Nat. Gas II Holdings, LP v. Hargis*, 2012 WL 4481303, at *4 (Del. Ch. Sept. 28, 2012) ("Substantive arbitrability involves, among other things, the applicability of an arbitration

33

arbitration clause."[28] The category of procedural arbitrability concerns "whether the parties have complied with the terms of an arbitration provision, and are presumptively handled by arbitrators." *Viacom*, 72 A.3d at 82 (cleaned up). Examples include "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met."[29]

In this case, the ultimate question of arbitrability is whether the court or an arbitrator must decide the merits of the claims that Fairstead and Affordable have asserted in this case. One dimension of that issue is whether the claims asserted in this case fall within the scope of the Employment Arbitration Agreement. But there is another, logically prior issue of arbitrability: Whether Fairstead and Affordable are bound by the Employment Arbitration Agreement such that there is a basis to compel them to arbitrate. Because of

---

clause, the scope of an arbitration provision, and whether an arbitration clause is valid and enforceable."); David Horton, *Pirate Arbitration*, 106 Minn. L. Rev 2111, 2124 n.103 (2021) [hereinafter Horton, *Pirate Arbitration*] ("[C]ourts presumptively decide 'substantive arbitrability': whether a dispute falls within the scope of a valid arbitration clause").

[28] *Howsam*, 537 U.S. at 83–84; *see also Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH*, 2011 WL 1348438, at \*15 (Del. Ch. Apr. 8, 2011) (citing *Kristian v. Comcast Corp.*, 446 F.3d 25, 39 (1st Cir. 2006) (identifying "two categories of disputes where we presume that courts rather than arbitrators should resolve the gateway dispute: (1) disputes about whether the parties are bound by a given arbitration clause; and (2) disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" (cleaned up)).

[29] *Id.* (quoting *Howsam*, 537 U.S. at 85); *see also* Horton, *Pirate Arbitration*, *supra*, at 2124–25 n.103 ("Arbitrators hear 'procedural arbitrability,' which encompasses topics that are likely to arise in arbitration, such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate." (cleaned up)).

the who-decides question, a court cannot move directly to addressing either issue. The court first must determine whether answering those questions is a job for the court or for an arbitrator.

### 2. The Who-Decides Question

"Before courts confront questions of procedural and substantive arbitrability, however, they first must address the threshold question of who should decide whether the parties have agreed to submit the arbitrability issue to arbitration." *Legend Nat. Gas*, 2012 WL 4481303, at *4 (cleaned up). As noted, Delaware and federal decisions hold that courts presumptively decide issues of substantive arbitrability,[30] while arbitrators presumptively decide issues of procedural arbitrability.[31]

Through delegation agreements, parties can contract over the who-decides question in ways that alter the presumptions. *First Options*, 514 U.S. at 938. Because of the

---

[30] *See, e.g.*, *Howsam*, 537 U.S. at 79 ("[I]n the absence of an agreement to the contrary, issues of substantive arbitrability . . . are for a court to decide." (quoting Revised Uniform Arbitration Act of 2000 ("RUAA") § 6(c) & cmt. 2, 7 U.L.A. 12–13 (Supp. 2002)); *Willie Gary*, 906 A.2d at 79 ("The court presumes that parties intended courts to decide issues of substantive arbitrability."); *accord AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

[31] *See, e.g.*, *Howsam*, 537 U.S. at 84 ("Procedural' questions which grow out of the dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide. So, too, the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability." (cleaned up)); *Julian v. Julian*, 2009 WL 2937121, at *4 (citing *Willie Gary*, 906 A.2d at 79) ("A presumption exists that questions of procedural arbitrability will be handled by arbitrators and not by courts.").

presumption that courts decide issues of substantive arbitrability, a delegation agreement must provide clear and unmistakable evidence of the intent to delegate an issue of substantive arbitrability to the arbitrator. *Id.* at 944 ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." (cleaned up)); *accord DMS Props.-First, Inc.*, 748 A.2d at 393.

Potentially difficult questions arise when a party raises a challenge to the arbitration agreement itself. There is obvious circularity in an arbitrator ruling on a challenge to the contract that gives rise to the arbitrator's authority to issue a ruling. If the arbitrator agrees with the challenge, then the arbitrator never had authority to address the challenge in the first place. And if a party must arbitrate a challenge to an arbitration agreement, then a party may have to prove in arbitration that they never agreed to arbitrate. Given these difficulties, whether an arbitrator can rule on a challenge to the arbitration agreement has been dubbed "the queen of all threshold issues." *MZM Constr.*, 974 F.3d at 392 (citation omitted).

The first step in the analysis is to determine whether the challenge targets the container contract or the arbitration agreement. The Supreme Court of the United States held over fifty years ago that when a party challenges the validity of the container contract on the grounds that it had been induced by fraud, the arbitrator had the authority to adjudicate the challenge. *Prima Paint*, 388 U.S. at 400. The Court reasoned that the arbitration agreement was severable from the container contract and conceptually distinct. Thus, unless the fraud related to the arbitration agreement itself, the arbitrator could adjudicate the fraud claim. *Id.*; *see Carlyle Inv. Mgmt. L.L.C. v. Nat'l Indus. Gp. (Hldg.)*,

2012 WL 4847089, at *10 (Del. Ch. Oct. 11, 2012) (describing rule in *Prima Paint*), *aff'd*,

67 A.3d 373 (Del. 2013).

The logic of *Prima Paint* has been generalized to other challenges to the enforceability of the container contract. *See* 21 Williston on Contracts § 57:27 (4th ed.). The severability principal applies to grounds for contract rescission, such as frustration of purpose, duress, unconscionability, and the like. *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 106 (3d Cir. 2000). Put differently, *Prima Paint* applies to any arguments that would render a contract voidable. *Id.* at 107. After *Prima Paint*, those challenges are for the arbitrator to decide. Only if the enforceability challenge targets the arbitration agreement itself must a court hear it. *MZM Constr.*, 974 F.3d at 397; *accord Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 326 (3d Cir. 2022).

A different rule applies "where the formation of the container contract is at issue." *MZM Constr.*, 974 F.3d at 397. The Supreme Court of the United States has emphasized repeatedly that challenges to the existence of the container contract are different from challenges to its validity.[32] A court must decide a dispute over the existence of the contract, because "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock Co. v. Int'l Bhd. of*

---

[32] *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 n.2 (2010) ("The issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded[.]'"); *Buckeye*, 546 U.S. at 444 n.1 ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and oblige was ever concluded.").

37

*Teamsters*, 561 U.S. 287, 296 (2010). If the challenge succeeds, the severability principle cannot operate to save the arbitration agreement because "the doctrine of severability presumes an underlying, existent, agreement." *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 106 (3d Cir. 2000).

The Supreme Court of the United States recently underscored this point in *Henry Schein*. In holding that a court must enforce a delegation agreement even if a court thought the argument for arbitrability was wholly groundless, the justices reiterated that a court must determine whether an agreement to arbitrate was formed:

> This Court has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by "clear and unmistakable" evidence. To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists. But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue.

*Henry Schein*, 139 S. Ct. at 530 (citations omitted).

A consistent line of decisions from the United States Court of Appeals for the Third Circuit holds that a court must address issues of contract formation before deferring to an arbitrator to resolve the who-decides question under a delegation provision.[33] Other courts

---

[33] *Field Intel. Inc v. Xylem Dewatering Sols. Inc.*, 49 F.4th 351, 356 (3d Cir. 2022); *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 140 (3d Cir. 2022); *MZM Constr.*, 974 F.3d at 402; *Sandvik*, 220 F.3d at 106; *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir.1980), *abrogated on other grounds by First Options*, 514 U.S. at 944, *as recognized in Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 287 (3d Cir. 2017).

of appeal have reached the same conclusion.[34] Parties can still contract to arbitrate an issue of contract formation, but the arbitration agreement must have an independent basis for existence outside of the challenged contract.[35]

In this case, the contract formation issue involves whether Fairstead and Affordable are parties to the Employment Arbitration Agreement. A contract only exists between parties to the agreement. *See Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 343 (Del. Ch. 2003) (collecting cases). "Under Delaware law, 'overt manifestation of assent—not subjective intent—controls the formation of a contract.'" *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971).

It is undisputed that Fairstead and Affordable are not signatories to the Employment Agreement, nor were they ever formally made parties to the Employment Agreement in some other way. Neither fact is dispositive when determining whether a party is bound by a forum selection provision, and "[a]n arbitration clause 'is, in effect, a specialized kind of forum-selection clause.'" *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d

---

[34] *In re: Auto. Parts Antitrust Litig.,* 951 F.3d 377, 385-86 (6th Cir. 2020)*; Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.,* 944 F.3d 225, 234 (4th Cir. 2019)*; Lloyd's Syndicate 457 v. FloaTEC, L.L.C.,* 921 F.3d 508, 515 (5th Cir. 2019)*; Neb. Mach. Co. v. Cargotec Sols., LLC,* 762 F.3d 737, 741 & n.2 (8th Cir. 2014); *Three Valleys Mun. Water District v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1140 (9th Cir. 1991).

[35] *MZM Constr.*, 974 F.3d at 402; *see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 838 F. Supp. 2d 967, 981 (C.D. Cal. 2012) ("[B]efore a Court may compel arbitration, § 4 of the FAA requires the Court to satisfy itself that the making of the agreement to arbitrate is not at issue.")

373, 384 n.41 (Del. 2013) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974)).

"It is not unusual for courts to require arbitration of claims involving parties who were not formally parties to an arbitration agreement, a situation that especially arises when affiliates of signatories are subject to or make claims." *McLaughlin v. McCann*, 942 A.2d 616, 627 (Del. Ch. 2008). "Courts have recognized at least five theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." *BuzzFeed, Inc. v. Anderson*, 2022 WL 15627216, at *8 (Del. Ch. Oct. 28, 2022). In this case, principles of estoppel are dispositive.

Because the authorities that list issues of procedural arbitrability often mention estoppel, it bears emphasizing up front that the application of estoppel to bind a party to an arbitration agreement is fundamentally different from the question of whether a party should be estopped from invoking a right to arbitrate under an existing arbitration agreement. The former addresses whether an arbitration agreement exists and is always an

issue for the court.[36] The latter, like issues of laches and waiver, is a question of procedural

arbitrability that is presumptively for the arbitrator.[37]

---

[36] *See, e.g.*, *Toyota*, 838 F. Supp. 2d at 967 (relying on FAA §§ 2 and 4 to conclude that issue of whether a non-signatory can enforce an arbitration agreement against a signatory under the doctrine of equitable estoppel is a threshold question for court rather than arbitrator, even when the agreement contains a delegation provision), *cited by a CVD Equip. Corp. v. Dev. Specialists, Inc.,* 2015 WL 4506052, at *2 n.7 (Del. Ch. July 23, 2015); *see also Meena Enters., Inc. v. Mail Boxes Etc.*, 2012 WL 4863695, at *3 (D. Md. Oct. 11, 2012) ("[T]hreshold issues of contract formation—including equitable estoppel— are properly subject to judicial determination." (citing *Toyota*)); *cf. Lavigne v. Herbalife, Ltd.*, 967 F.3d 1110, 1120 (11th Cir. 2020) ("Threshold questions of arbitrability can be delegated to an arbitrator by contract. But how does one go about delegating the question of equitable estoppel? By definition, there is no contract, which is, after all, why one of the parties is demanding equitable estoppel. So, if there is no contract, how can the issue of equitable estoppel be delegated in the first place?").

[37] *E.g., Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Flair Builders, Inc.*, 406 U.S. 487, 491–92 (1972) ("[N]othing we say here [about the equitable defense of laches] diminishes the responsibility of a court to determine whether [the parties] have agreed to arbitration. That issue, as well as the scope of the arbitration clause, remains a matter for judicial decision. . . . But once a court finds that, as here, the parties are subject to an agreement to arbitrate, and that agreement extends to 'any difference' between them, then a claim that particular grievances are barred by laches is an arbitrable question under the agreement."); *Chi. Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 860 F.2d 1420, 1424 (7th Cir. 1988) ("Procedural issues, including the standing of a party to the arbitration, the *res judicata* effect of a prior arbitration award and the timeliness of filing a grievance, are for the arbitrator, so long as the subject matter of the dispute is within the arbitration clause."). *See generally* M.J. Greene, Annotation, *Waiver of, or Estoppel to Assert, Substantive Right to Arbitrate As Question for Court or Arbitrator*, 26 A.L.R. Fed. 3d 604 (1969), Westlaw (database updated weekly) ("[A]lthough recognizing that courts, rather than arbitrators, have the task of determining questions whether the dispute comes within the purview of the arbitration agreement, courts, subsequently to the decision in *John Wiley & Sons, Inc. v Livingston*, have generally recognized that where the question of waiver or estoppel is predicated upon a failure to comply with the procedural aspects of the arbitration agreement, the question is one for the arbitrator, and not for the court, to decide.") (collecting authorities); RUAA, *supra*, § 6 cmt. 5 ("Waiver is one area where courts, rather than arbitrators, often make the decision as to enforceability of an arbitration clause.").

A non-signatory can be bound to a forum selection provision under principles of equitable estoppel if the non-signatory has accepted a direct benefit under the agreement. "The doctrine of equitable estoppel prevents the non-signatory from accepting the benefits of the agreement without also accepting its burdens, including the forum selection provision."[38] In such circumstances, "an estoppel may arise in light of the knowing acceptance of the benefits of the contract."[39] "Delaware courts have deemed both pecuniary and non-pecuniary benefits sufficient to satisfy the test." *Neurvana Medical, LLC v. Balt USA, LLC*, 2019 WL 4464268, at *4 (Del. Ch. Sept. 18, 2019) (collecting cases). "The benefits must be direct; indirect benefits have been deemed insufficient. And they must actually be received; the mere 'contemplation' of a benefit does not directly confer one." *Fla. Chem*, 262 A.3d at 1091 (cleaned up).

The direct-benefit test applies here. Fairstead and Affordable benefited directly from the services that Blodgett provided under the Employment Agreement.

---

[38] *Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1074 (Del. Ch. 2021); *see Cap. Gp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *6–7 (Del. Ch. Nov. 3, 2004) (citing *Scherk*, 417 U.S. at 519).

[39] *Sustainability P'rs LLC v. Jacobs*, 2020 WL 3119034, at *6 (Del. Ch. June 11, 2020); *see E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001) (applying Delaware law) ("In the arbitration context, the doctrine [of equitable estoppel] recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.").

- The plain language of the Employment Agreement evidences the parties' intent that Blodgett would provide services to other entities in the fund complex, including the Employee Strategy SPVs that would use his investment strategies.

- The plain language of the Employment Agreement evidences the parties' intent that one or more entities would serve as general partners for and manage the SPVs, meaning that Blodgett would provide services to those entities.

- In return for providing services to the general partners of the SPVs, Blodgett would receive at least 15% of the carried interest that the general partners received.

- Fairstead and Affordable are entities that served as the general partners of the SPVs, received the carried interest in the SPVs, and allocated Blodgett's share of the carried interest to him through his member interest.

- The LLC Agreements reference the Employment Agreement and confirm that Blodgett received his 15% interest in those entities as a form of compensation for his services.

- Fairstead and Affordable are affiliates of Fortitude, meaning that they were under the common control of the parties to the Employment Agreement when the Employment Arbitration Agreement was prepared. *See* Dkt. 22 Ex. B (referring to Fairstead and Affordable as affiliates of Fortitude).

- Blodgett worked under this arrangement for eight years, building a business that benefitted Fairstead and Affordable.

- In their complaint in this action, Fairstead and Affordable acknowledge that Blodgett received his units in return for his services as an employee. Compl. ¶ 112. In their reply brief, Fairstead and Affordable concede that "Blodgett was employed by, and performed services on behalf of, each of the Plaintiffs." Dkt. 23 at 2.

These factors are sufficient to hold that under the direct benefit test, Fairstead and Affordable accepted direct benefits generated by the Employment Agreement and should be treated as parties to it for purposes of the Employment Arbitration Agreement.

Although it is not necessary to go further, another strain of estoppel supports this conclusion. Under principles of promissory estoppel, a party can promise to litigate in a particular forum on behalf of itself and one or more controlled affiliates. "Having induced

43

its counterparties to rely on that promise, the party cannot later renege on its promise by using a controlled affiliate to escape the forum selection provision." *Fla. Chem.*, 262 A.3d at 1090. In this case, it was foreseeable when the parties entered into the Employment Agreement that Feldman, Goldberg, and Blodgett would be forming additional entities, which they controlled, and that Blodgett would be providing services to those controlled entities. Admittedly, those entities did not yet exist, but it was foreseeable that they would be formed. The Employment Agreement specifically contemplated that outcome. It was also foreseeable that the Employment Arbitration Agreement would extend to those entities for purposes of disputes falling within its scope. Otherwise, it would be easy to bypass the Employment Arbitration Agreement by having one of the new entities sue.

Fairstead and Affordable were two of the entities that Feldman, Goldberg, and Blodgett formed to pursue the business arrangement documented in the Employment Agreement. The LLC Agreements for those entities refer to the Employment Agreement and note that Blodgett received member interests in the LLCs as part of the compensation contemplated by the Employment Agreement. It was again foreseeable that the Employment Arbitration Agreement would extend to those entities for purposes of disputes falling within its scope.

Fairstead and Affordable are therefore bound by the Employment Arbitration Agreement.

### 3. The Delegation Question

Blodgett argues that once the court has determined that Fairstead and Affordable are bound by the Employment Arbitration Agreement, then the court's role is largely over.

44

As Blodgett sees it, the Employment Arbitration Agreement contains clear and unmistakable evidence of the parties' intent to have an arbitrator decide whether a particular dispute falls within the scope of the provision. He maintains that because he has asserted that the claims in this action are arbitrable, an arbitrator must decide that issue, regardless of how a court might view the argument. *Henry Schein*, 139 S. Ct. at 529. Still, there remains a gateway issue for the court to decide: whether the Employment Arbitration Agreement contains clear and unmistakable evidence of the parties intent to arbitrate over arbitrability. In this case, the combination of the Employment Arbitration Agreement and the LLC Forum Provision means that the court must decide the arbitrability question.

After *First Options*, the American Arbitration Association ("AAA") amended its commercial rules to grant its arbitrators the power to decide the issue of arbitral jurisdiction. In response to that move, litigants seeking to force disputes into arbitration argued that when a party agreed to arbitrate before the AAA, that party necessarily agreed to follow the rules of the AAA, including the rule on arbitrators deciding their own jurisdiction. A majority of federal courts embraced that argument, holding that when parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate those issues to an arbitrator. *Willie Gary LLC v. James & Jackson LLC*, 2006 WL 75309, at *7 (Del. Ch. Jan. 10, 2006) (describing case law), *aff'd*, 906 A.2d 76 (Del. 2006).

In *Willie Gary*, this court rejected that line of authority, holding that more was required to prove clear and unmistakable evidence of an intent to arbitrate arbitrability. *Id.*

45

On appeal, while affirming the result that the trial court reached on the facts of the case, the Delaware Supreme Court held as a matter of policy that Delaware would follow the majority federal rule. *Willie Gary*, 906 A.2d at 80. As framed by the Delaware Supreme Court, parties have evidenced a clear intent to arbitrate the question of arbitrability "where the arbitration clause generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability." *Id.*

If the Employment Arbitration Agreement stood alone, then the *Willie Gary* test would be satisfied. Delaware decisions have held that arbitration provisions are sufficiently broad under *Willie Gary* when they encompass all claims arising out of or relating to an agreement.[40] The Employment Arbitration Agreement states, in pertinent part that "[a]ll disputes, claims or controversies, that in any way relate to, arise under, or arise in connection with this Agreement or Employee's employment at Employer, shall be submitted to binding arbitration." EA § 16. The plain language of the Employment Arbitration Agreement satisfies *Willie Gary*'s breadth requirement.

The Employment Arbitration Agreement also incorporates the rules of an arbitral tribunal that empower an arbitrator to determine questions of substantive arbitrability. It

---

[40] *See, e.g.*, *Orix LF, LP v. Inscap Asset Mgmt., LLC*, 2010 WL 1463404, at *7 (Del. Ch. Apr. 13, 2010) ("Delaware courts have found the use of both 'arising out of' and 'relating to' language in an arbitration provision to be a broad mandate."); *State v. Philip Morris USA, Inc.* 2006 WL 3690892, at *4 (Del. Ch. Dec.12, 2006) (finding provision requiring arbitration of any dispute "arising out of or relating to" language to be a "broad arbitration clause"), *aff'd,* 925 A.2d 504 (Del. 2007); *see also GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 715922, at *6 (Del. Ch. Feb. 23, 2017) (finding a clause containing that covered all disputes, claims or controversies sufficiently broad).

states that "[t]he arbitration will be administered by JAMS." *Id.* Arbitral proceedings before JAMS proceed under the JAMS Comprehensive Arbitration Rules & Procedures (the "JAMS Rules"), which contain the following provision:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

JAMS Rule 11(b). The rules thus give JAMS the authority to address disputes over the "interpretation or scope of the agreement under which Arbitration is sought." *Id.* That is sufficient under *Willie Gary* to empower the arbitrator to determine whether a particular dispute must be arbitrated.[41]

The Employment Arbitration Agreement thus provides clear and unmistakable evidence of an intent to delegate the who-decides issue to an arbitrator. If the analysis stopped there, then the court would have no role to play beyond ordering the parties to arbitrate whether the claims asserted in this case fall within the Employment Arbitration

---

[41] Notably, the JAMS provision attempts to grant its arbitrators not only the power to decide the issue of arbitrability, but also the power to decide "disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought." For the reasons explained in prior sections, JAMS can exercise that authority for purposes of disputes over the validity, interpretation, or scope of the container contract, but not over the formation or existence of the container contract. JAMS also cannot exercise that authority over challenges targeting the arbitral agreement itself, distinct from the container contract.

Agreement. Even if the court were to view the arguments for arbitrability as wholly frivolous, they would still be for the arbitrator to decide.

But the Employment Arbitration Agreement does not stand alone. There is also the LLC Forum Provision. "This court has cautioned that the *Willie Gary* framework should not be applied 'reflexively in the multiple-contract scenario.'" *AffiniPay, LLC v. West*, 2021 WL 4262225, at *5 (Del. Ch. Sept. 17, 2021). "Rather, if various contracts are implicated in a claim and those contracts diverge on the matter of arbitral dispute resolution, *Willie Gary*'s requirement that a provision mandate the arbitration of 'all disputes' is impossible to satisfy." *Id.* When conflicting choice-of-forum provisions "muddy the parties' intentions regarding substantive arbitrability, it cannot be said that the parties intended to submit the question of substantive arbitrability to the arbitrator." *BuzzFeed*, 2022 WL 15627216, at *7; *accord TowerHill Wealth Mgmt., LLC v. Bander Family P'ship, L.P.*, 2008 WL 4615865, at *3 (Del. Ch. Oct. 9, 2008) ("[W]here there are various dispute resolution clauses in play in various contracts, it is impossible to select one and say it applies generally to all disputes.").

A recent decision from the United States Court of Appeals for the Third Circuit reaches the same conclusion on different grounds. There, as here, the parties entered into an initial arbitration agreement, then subsequently entered into a second agreement that contained an integration clause and provided for a judicial forum for disputes. *Field Intel.*, 49 F.4th 351 at 354. The parties disputed whether the later agreement superseded the first. The court held that "the parties' supersession dispute is for a court, not an arbitrator, to decide." *Id.* at 356. The court reached that conclusion because whether the later agreement

48

displaced the first raised a question about whether an arbitration agreement existed, which only a court could address. *Id.*

Both lines of reasoning apply to the current case. The competing forum provisions prevent the court from finding clear and unmistakable evidence of an intent to arbitrate arbitrability, and the implications of the LLC Agreements raises another question as to whether an agreement to arbitrate exists. The court therefore must determine whether the claims in this case are subject to arbitration.

## B. Whether The Claims In This Case Must Be Arbitrated

The ultimate question at this stage of the case is whether the claims that Fairstead and Affordable have asserted must be arbitrated. To determine whether the claims in this case must be arbitrated, the court must construe the plain language of the LLC Agreements, including the LLC Forum Provision, taking into account the Employment Arbitration Agreement. That analysis demonstrates that none of the claims in this case are subject to arbitration.

"When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). The "contract's construction should be that which would be understood by an

objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal citation omitted). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley*, 41 A.3d at 385 (footnote omitted). If the language of an agreement is ambiguous, then the court "may consider extrinsic evidence to resolve the ambiguity." *Salamone*, 106 A.3d at 374. Permissible sources of extrinsic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry." *Id.* (cleaned

up). A court may consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). "When the terms of an agreement are ambiguous, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Sun-Times Media Gp. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (cleaned up). "The private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common." *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (cleaned up).

The analysis starts and largely ends with the LLC Integration Clause in the LLC Agreements. An integration clause should be interpreted according to its "plain meaning when its terms are unambiguous." *Barton*, 2013 WL 6072249, at *6. When a "subsequent agreement" contains a valid integration clause, it "supersedes" the terms of any prior agreement covering the same subject matter. *See, e.g.*, *ESG Cap. P'rs II, LP v. Passport Special Opps. Master Fund, LP*, 2015 WL 9060982, at *11 (Del. Ch. Dec. 16, 2015). When a prior agreement and a subsequent agreement cover the same subject matter and the subsequent agreement contains an integration clause, the prior agreement "need[s] to be memorialized in [the subsequent agreement]" to survive. *Hunt v. Limestone Med. Prop., LLC*, 2018 WL 2939441, at *4 (Del. Ch. June 11, 2018).

In this case, the plain language of the LLC Integration Clause establishes that the written terms of the LLC Agreements "embody the entire understanding and agreement between the Members concerning the subject matter hereof and supersede any and all prior

51

negotiations, understandings or agreements with respect thereto." Fairfield LLCA § 12.4. As to disputes under the LLC Agreements, the Employment Arbitration Agreement has no role to play.

Blodgett argues that there is no conflict between the LLC Agreements and the Employment Agreement such that both can coexist. As to many issues, that is likely true. That is not true as to the competing forum selection provisions, where the Employment Arbitration Agreement conflicts with the LLC Forum Provision. As to claims for breach of the LLC Agreements, the LLC Integration Clause wipes out the Employment Arbitration Agreement, leaving the LLC Forum Provision to control.

All of the claims that Fairstead and Affordable are pursuing invoke provisions of the LLC Agreements. Fairstead and Affordable seek declarations that Blodgett breached the LLC Confidentiality Provision and the LLC Good Faith Provision. Fairstead and Affordable also invoke the LLC Cancellation Provision. Therefore, the LLC Forum Provision applies, and those claims must be litigated here. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 880–81 (Del. Ch. 2022) ("The plaintiffs are not litigating claims or issues under the Employment Agreement. They are litigating an issue under the [LLC] Agreement[s] . . . Because the court is not interpreting the Employment Agreement, the arbitration provision does not apply.").

Blodgett argues that the claims that Fairstead and Affordable have asserted necessarily arise out of his employment. It is true that the plaintiffs have asserted claims which "relate to . . . Employee's employment" and therefore nominally fall within the scope of the Employment Arbitration Agreement. The subsequently executed LLC Agreements

52

with the LLC Integration Clause and LLC Forum Provision override that fact as to claims under the LLC Agreements.

The common nucleus of fact that underlies the claims in this case and the matters at issue in the arbitration is not enough for the court to send the claims in this case to arbitration. In *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149 (Del. 2002), the Delaware Supreme Court held that an arbitration provision in one contract would not extend to claims that "would be independently and separately assertable" even if the agreement did not exist. *Id.* at 157. A cause of action is independently and separately assertable if it "could [have been] brought had the parties not signed" the contract containing the arbitration clause. *Id.* at 156 n.24. In this case, the plaintiffs have asserted claims that do not rely on the Employment Agreement and are independently and separately assertable. *See, e.g.*, *UtiliSave, LLC v. Miele*, 2015 WL 5458960, at \*5 (Del. Ch. Sept. 17, 2015); *Feeley v. NHAOCG*, LLC, 62 A.3d 649, 656 (Del. Ch. 2012).

Blodgett is also correct that before filing this action, Feldman and Goldberg caused their entities to assert claims under the Employment Agreement. Any claims for breach of the Employment Agreement must be arbitrated. Blodgett has asserted claims for breach of the Employment Agreement in his arbitration demand, and he may obtain declaratory rulings regarding the claims of breach that Feldman and Goldberg caused their entities to make. Those issues fall within the scope of the Employment Arbitration Agreement and are for the arbitrator to decide.

This court therefore will not be addressing, for example, whether Blodgett violated the Employment Confidentiality Provision or the Employment Compliance Provision. Nor

53

will this court be addressing whether Blodgett's member interests could be canceled under the Employment Cancellation Provision. This court will determine whether Fairstead and Affordable can prove breaches of the LLC Confidentiality Provision and the LLC Good Faith Provision, as well as whether Blodgett's membership interest can be canceled under the LLC Cancellation Provision.

Notably, the LLC Cancellation Provision references the Employment Agreement and the consequences a potential termination for violating the Employment Confidentiality Provision or the Employment Compliance Provision. The operative language states:

> [I]f any Affiliate of the Company terminates Mr. Blodgett's employment for any reason other than as a result of his unauthorized disclosure of certain proprietary information of such Affiliate or his noncompliance of such Affiliate's policies (including, for the avoidance of doubt, his breach of [the Employment Confidentiality Provision or the Employment Compliance Provision]), no Interest held by Mr. Blodgett shall be forfeited or canceled.

This is not a situation in which an LLC agreement incorporated concepts from an employment agreement when framing standards for the LLC agreement. *Cf. Metro Storage*, 275 A.3d at 880 ("The fact that the plain language . . . of the [LLC] Agreement incorporates concepts and standards from the Employment Agreement does not convert an issue raised by the [LLC] Agreement into an issue under the Employment Agreement."). This is a case where applying this aspect of LLC Cancellation Provision would require a predicate determination under the Employment Agreement. The court will not adjudicate whether Blodgett was properly terminated for breach of either the Employment

Confidentiality Provision or the Employment Compliance Provision. To the extent those determinations are necessary, the court will await a ruling by the arbitrator.

This ruling means that the parties must go forward both in this court and in arbitration. That outcome creates unfortunate inefficiencies. The court would happily send the entire dispute to arbitration if the language of the agreements could support it. Fortunately, the parties have the ability to solve their problem. They can address any concerns about the scope of arbitration by agreeing to arbitrate as if the rules of this court applied. They could even agree to arbitrate before a former member of this court. And arbitration would enable the parties to keep confidential information confidential, free from that pesky First Amendment right of public access that this court vigilantly protects. The parties thus have easy ways to avoid the dispute resolution collision that their contracts generated. The choice is up to them.

## III.   CONCLUSION

For the reasons set forth herein, absent a further arbitration agreement, the parties must litigate the claims asserted in this action in this court. As a matter of law, the parties cannot arbitrate claims arising under the LLC Agreements. Summary judgment is granted in the plaintiffs' favor on that issue, and a permanent injunction will issue barring Blodgett from litigating any claims arising under the LLC Agreements in the arbitration he initiated.